IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BASLER ELECTRIC COMPANY,

       Plaintiff,

vs.

FORTIS PLASTICS, LLC and
REALIZATION SERVICES, INC.,

       Defendants.

Case No. 12-cv-713-JPG-DGW

**MEMORANDUM AND ORDER**

This matter comes before the Court on defendants Fortis Plastics, LLC's ("Fortis") and Realization Services, Inc.'s ("RSI") (collectively "Defendants") motion for summary judgment (Doc. 50). Plaintiff Basler Electric Company ("Basler") filed its response (Doc. 52) to which Defendants replied (Doc. 53). For the following reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.

**I.    Background**

This dispute between Basler and Fortis arises from the way in which their business relationship abruptly ended. Basler produces power and magnetic system products that it ships worldwide. For years, Basler purchased certain plastic components from Fortis and its predecessors necessary for the production of Basler's product. Basler furnished Fortis with certain tooling and equipment necessary to produce these plastic components.

On September 22, 2010, Basler and Fortis entered into a Purchase Agreement which provided that Basler would issue purchase orders to Fortis directing Fortis to produce the plastic components. Basler and Fortis also entered into a Tooling Agreement dated November 7, 2011,

that listed the tools in Fortis' possession that belonged to Basler. The Tooling Agreement provided as follows:

> Supplier acknowledges that Basler owns all of the above equipment and documentation and as such Supplier agrees that Basler may at any time upon notifying supplier come to Supplier[']s facility to remove the equipment listed above.

Doc. 51-3, p. 11.

In 2011, Fortis began to suffer financial hardships. As a result, Fortis hired RSI, a strategic consulting firm specializing in "turnaround management and value enhancements of distressed companies" to assess and make recommendations for its business. Barry Kasoff is the founder and president of RSI. Fortis also appointed Kasoff as its Chief Restructuring Officer ("CRO"). Based on Kasoff's dual roles, the parties dispute in which capacity he was acting at times relevant to this dispute. Basler contends that Kasoff was never a Fortis employee because he was neither employed nor paid by Fortis; he merely held the CRO title. Fortis and RSI maintain that Kasoff was acting in his role as CRO during the relevant time period. The evidence indicates Kasoff represented himself in both capacities – as Fortis' CRO and RSI's president. *See* Doc. 51-14, p. 29 & Doc. 52-8, p. 5. (Kasoff's deposition in which he identifies himself as RSI's president and Fortis' CRO). The evidence further indicates Kasoff was paid directly by RSI, not Fortis. Doc. 52-8, p. 5.

Setting aside the true nature of Kasoff's role, the parties agree that Kasoff directed Fortis to stop accepting Basler's purchase orders because RSI and Kasoff believed Fortis was losing money on its transactions with Basler. *See* Doc 51-14, p. 36; Doc 51-14, p. 48 (RSI advised Fortis not to accept further purchase orders from Basler because RSI concluded that Fortis was losing money on its transactions with Basler). Specifically, at Kasoff's direction, Jason Peters,

2

Fortis' regional sales manager, sent an email to Ralph Boester, a Basler buyer, informing him that Fortis refused to accept any further purchase orders from Basler.

Peters further informed Boester that Fortis would ship Basler's finished orders upon receipt of Basler's outstanding payments. Basler then sought to take immediate possession of its tooling so it could obtain its plastic components from another source. Fortis refused to return the tooling until Basler paid its outstanding balance. Eventually, Fortis released the tooling to Basler on March 15, 2012, after receipt of $355,000. Basler asserts it discovered that Fortis had damaged the tools while they were in Fortis' possession. Further, Basler asserts its resulting shipping delays caused by Fortis' refusal to comply with the purchase orders and release the tooling negatively impacted Basler's business, including the loss of at least one customer.

On May 17, 2012, Basler filed its four-count complaint in the Circuit Court for the Third Judicial Circuit, Madison County, Illinois, alleging (1) breach of contract against Fortis, (2) breach of warranty against Fortis, (3) tortious interference against RSI, and (4) conversion against Fortis and RSI. Defendants removed the case to this Court. Subsequent to removal, Basler filed an amended tortious interference claim. Defendants now argue they are entitled to summary judgment on Basler's conversion claim against Defendants, tortious interference claim against RSI, punitive damages request, and request for damages with respect to Basler's tooling. The Court will now consider whether Defendants are entitled to judgment as a matter of law.

**II.     Analysis**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the

evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252. The Court will proceed to analyze whether Defendants are entitled to judgment as a matter of law under any of their arguments.

    **a. Conversion Claim**

Basler's conversion claim against Defendants alleges that Defendants wrongfully held Basler's tooling when Defendants denied Basler's demand for immediate possession of the tooling. Under Illinois law, Basler must establish the following elements to prevail on its conversion claim: "(1) [it] has a right to the property; (2) [it] has an absolute and unconditional right to the immediate possession of the property; (3) [it] made a demand for possession; and (4)

4

the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998).

Defendants first contend that Basler's conversion claim against Defendants must fail because Fortis held a statutory lien over the tooling entitling Fortis to maintain possession of the tooling until receipt of payment from Basler. Basler maintains that even if Fortis had a lien, the amount it requested exceeded the scope of its lien, and Defendants are liable in conversion for the amounts in excess of the lien. Finally, RSI argues it cannot be liable for conversion because it never had physical possession of the tooling.

### i. Illinois Tool and Die Lien Act

Defendants first argue Basler cannot establish the second and fourth elements of a conversion claim because Fortis held a statutory lien pursuant to the Illinois Tool and Die Lien Act ("ITDLA"). The ITDLA provides that

> Plastic or metal processors or persons conducting a plastic or metal processing business shall have a lien on the tools, dies, molds, jigs, fixtures, forms or patterns in their possession belonging to a customer, for the balance due them from such customer for plastic or metal processing work, and for all materials related to such work. The processor may retain possession of the tool, die, mold, jig, fixture, form or pattern until such balance is paid, subject only to a security interest properly perfected pursuant to Article 9 of the Uniform Commercial Code.

770 ILCS 105/1. The ITDLA further provides that

> Before enforcing a lien as provided for in subsection (A) of Section 1 of this Act, an initial notice in writing shall be given to the customer, either delivered personally or sent by registered mail to the last known address of the customer. This notice shall state that a lien is claimed in the amount therein set forth or thereto attached for processing work contracted or performed for the customer. This notice shall also include a demand for payment.

770 ILCS 105/3. Basler contends Fortis never held an ITDLA lien because Fortis never gave written notice, as required by Section Three, that Fortis was claiming a lien on Basler's tools.

Both parties cite to *Macneil Automotive Products., Ltd. v. Cannon Automotive Ltd.*, for support. No. 08-C-0139, 2012 WL 5306281 (N.D. Ill. Oct. 26, 2012). In *Macneil*, the defendant maintained possession of the plaintiff's tools and sent a letter to the plaintiff explaining defendant would hand over the tools upon receipt of plaintiff's unpaid invoices. *Id*. at *12. In arguing it was entitled to summary judgment on plaintiff's conversion claim, the defendant contended it held a lien pursuant to the ITDLA. *Id*. The plaintiff argued the defendant did not hold a lien because the defendant's letter did not provide sufficient notice under the ITDLA that it was claiming a lien because the letter failed to mention either a lien or the ITDLA. *Id*. The district court denied the defendant's motion for summary judgment finding that "a trier of fact could conclude that [the defendant] gave [the plaintiff] no notice it was exerting a lien on [the plaintiff]'s tools." *Id*.

*Macneil* provides support for Basler's position. Like the *Macneil* defendant, Fortis sent a written communication explaining it would not release the tools until receipt of Basler's outstanding balance. Fortis' email, like the *Macneil* letter, failed to mention either a lien or the ITDLA. Following *Macneil*'s reasoning, a trier of fact could conclude that Fortis gave Basler no notice it was exerting a lien. This reasoning, however, presumes that Fortis was required to give notice to Basler prior to attachment of the lien. *Macneil*'s interpretation of the Act is inconsistent with the plain reading of the ITDLA, at least one other court's interpretation, and contrary to the way in which possessory liens traditionally attach.

Section One of the ITDLA provides that a plastics processor "shall have a lien on the tools . . . in their possession belonging to a customer." 770 ILCS 105/1. This language is mandatory and does not mention the necessity of notice prior to attachment. *See Plasti-World Prods., Ltd. v. Burgundy Prods. Mfg.*, No. 98-C-4348, 1999 WL 1270714, at *6 (N.D. Ill. Dec.

6

29, 1999). Section One further explains that the processor "may retain possession of the tool . . . ." until the customer's balance is paid. 770 ILCS 105/1. Again, this portion of the statute does not require the processor to provide notice before maintaining possession of the tools. In Section Five, however, notice is required "[b]efore *enforcing* a lien . . . ." 770 ILCS 105/3 (emphasis added). Accordingly, based on the plain language of Section Three, notice was only required before Fortis decided to enforce the lien, not before the existence or attachment of the lien. *See Plasti-World Prods., Ltd.*, 1999 WL 1270714, at *6.

Other statutory lien provisions provide attachment and notice requirements similar to the ITDLA. For instance, under the Self-Service Storage Facility Act, the storage facility owner automatically possesses a lien on the personal property stored in the storage facility, without providing notice to the customer, which attaches the date the personal property is placed in storage. 770 ILCS 95/3. It is not until the storage facility owner decides to enforce the lien through a lien sale that the owner must provide notification to the customer. 770 ILCS 95/4; *See Hausen v. PS Illinois Trust*, 11-C-6888, 2012 WL 266169, at *7 (N.D. Ill. Jan. 29, 2012). Under this statutory scheme, a customer would not have an absolute and immediate right to possess the property stored in the storage unit even absent a notice. *Hausen*, 2012 WL 266169, at *7.

Here, based on the statutory language and similar lien provisions, Fortis obtained a lien on Basler's tools to secure any "balance due them from [Basler] for plastic . . . processing work, and for all materials related to such work." *See* 770 ILCS 95/1. Similar to the statutory lien under Illinois' Self-Service Storage Facility Act, Fortis automatically obtained a lien on the tools upon their receipt until the time that Basler paid its balance. Pursuant to the Section Three of the ITDLA, Fortis was not required to give notice to Basler until it decided to enforce the lien by selling the tools. The Court notes Defendants do not argue that the language in the tooling

7

agreement (Doc. 51-3, p. 11) provided a waiver of this lien. As such, the Court will not address the tooling agreement's impact on the ITDLA lien.

### ii. Extent of the Lien

Second, Basler argues that even if Fortis had a lien, the tools Fortis withheld exceeded any amount that was owed and extended beyond Fortis' right to withhold the tools. Basler relies on *In re S.M. Acquisition Co.* for its argument that the ITDLA provides only a specific lien tied to a particular tool and is limited to payment for processing. *See In re S.M. Acquisition Co.*, 03-C-7072 & 05-C-1037, 2005 WL 6292653 (N.D. Ill. Sept. 12, 2005). First, Basler contends that Fortis was required to give it notice tying particular lien amounts to particular tools. The Court, however, has already concluded that the statute does not require notice before the lien attaches. Second, based on *In re S.M. Acquisition Co.*, Basler argues that any lien that Fortis may have had did not entitle Fortis to demand Basler pay *all* its debt, specifically any debt not related to a particular tool and its related processing, prior to return of the tools.

*In re S.M. Acquisition Co.*, on appeal from the bankruptcy court, concerned a dispute over an ITDLA lien between the bank-creditor and a plastics processor that produced plastic components for the debtor. *Id.* at *1. The district court concluded that the processor's ITDLA lien attached to a specific tool or die and corresponded to a specific debt. *Id.* at *15. The bank had a lien that arose in November 1997, and the parties had stipulated that the debtor had paid for all pre-November 1997 processing work in 1999. *Id.* After the pre-November 1997 debt was satisfied, that Court concluded that the bank's lien gained priority over the post-November 1997 processing work. *Id.*

In making its decision, the court specifically rejected the processor's argument that the ITDLA granted a general lien over all of the debtor's property until all debts were extinguished.

*Id*.  As the court noted, interpreting the statute to impose a general lien would make the first clause of the second sentence of 770 ILCS 105/1 ("The processor may retain possession of the tool, die, mold, jig, fixture, form or pattern until such balance is paid . . . ") redundant.  *Id*.  Interpreting the statute to impose a specific lien "gives the phrase meaning in identifying that the possessory lien is tied to '*the* tool, die, mold, etc.' that gave rise to the debt, which exists until '*such* balance is paid,' meaning the balance related to the processing work created from the particular tool, die, or mold."  *Id*.  The court further noted this interpretation was appropriate because it was in conformity with interpretations of the common law artisan's lien from which this statutory provision was derived.  *Id*.; 51 Am. Jr. 2d Liens, § 55 ("a statutory lien that is merely declaratory of the common law must be interpreted in conformity with common-law principles").

The Court finds *In re S.M. Acquisition Co.*'s conclusion persuasive and similarly concludes that the ITDLA imposes a specific lien on a specific tool until the balance related to the processing working created from the tool is paid.  Here, there is not sufficient evidence before the Court to determine whether the debts alleged by Fortis arose from processing work created by the specific tools it retained.  For that reason, the Court cannot grant summary judgment in favor of Fortis on Basler's conversion claim.

### iii. RSI's Liability for Conversion

Next, RSI argues that it is entitled to judgment as a matter of law because RSI never had possession of Basler's tooling.  Basler responds that the decision to withhold the tooling was made by Kasoff, RSI's principal and Fortis' CRO.  RSI, however, contends that Kasoff's decision to withhold Basler's property was made in his capacity as Fortis' CRO, not in his capacity as RSI's principal and RSI therefore cannot be liable for conversion.

9

Under Illinois law, a party need not personally have possession of the wrongfully converted property to be liable for conversion. *Nat'l Acceptance Co. of America v. Pintura Corp.*, 418 N.E.2d 1114, 1117 (Ill. App. Ct. 1981) ("[T]he essence of conversion is not acquisition of property by the wrongdoer, but deprivation of the owner."); *Daniels v. Powell*, 604 F. Supp. 689, 696 (N.D. Ill. 1985). Accordingly, the fact that RSI never possessed Basler's tools is irrelevant to the determination of RSI's liability for conversion. While RSI argues that Kasoff was acting in his role of Fortis' CRO when he directed Fortis to withhold the property, there is evidence that he was in fact operating in his role as president of RSI. The parties do not dispute that Kasoff held both positions simultaneously. The evidence actually indicates that RSI compensated Kasoff for his work performed as Fortis' CRO and Fortis never directly compensated Kasoff. Accordingly, viewing the evidence in the light most favorable to Basler, RSI could be liable for Kasoff's direction that Fortis withhold Basler's tooling. Thus, for the foregoing reasons, the Court must deny Fortis' and RSI's motion for summary judgment with respect to Basler's conversion claim.

### b. Tortious Interference

RSI next argues that it is entitled to judgment as a matter of law on Basler's tortious interference with a contract claim. Specifically, RSI argues that any resulting breach was the result of Kasoff's actions as Fortis' CRO, not RSI's actions. In the alternative, even if Kasoff was acting as president of RSI, RSI was considered an agent of Fortis and his conduct was privileged under Illinois law. Basler argues Kasoff was not acting as either Fortis' officer or agent, but was acting as an independent third party and his conduct was not privileged.

Under Illinois law, a plaintiff must show the following to establish a tortious interference with a contract claim:

10

> (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages.

*Echo, Inc. v. Timberland Machs. & Irrigation, Inc.*, 661 F.3d 959, 968 (7th Cir. 2011) (citing *Purmal v. Robert N. Wadington & Assocs.*, 820 N.E.2d 86, 98 (Ill. App. Ct. 2004)).  Illinois law provides for a conditional privilege to corporate officers and agents against a claim of tortious interference with the principal's contract with a third party.  *Stafford v. Puro*, 63 F.3d 1436, 1442 (7th Cir. 1995); *Traum v. Equitable Life Assur. Soc'y of the United States*, 240 F. Supp. 2d 776, 792 (N.D. Ill. 2002).  "To overcome the privilege, it must be shown that the [corporate officer's or] agent's conduct was malicious and unjustified, which generally requires a showing that the agent acted in its own interests and contrary to the interests of its principal, or that it engaged in conduct totally unrelated or antagonistic to the interest giving rise to the privilege."  *Traum*, 240 F. Supp. 2d at 792; *Stafford*, 63 F.3d at 1436.

Here, based on the aforementioned Illinois law, Kasoff's actions were privileged if he were considered either an officer or agent of Fortis.  Basler has failed to provide any evidence that would suggest Kasoff's actions were malicious or unjustified.  To the contrary, the evidence shows that Kasoff believed Fortis was losing money on its sales to Basler and that Kasoff directed that Fortis decline future purchase orders for Fortis' financial benefit.  Even if this advice was beneficial to RSI, Basler produces no evidence that this advice was contrary to Fortis' interests.  The evidence actually suggests this advice furthered Fortis' financial interests.  Further, there is no evidence that Kasoff's advice was unrelated or antagonistic to his relationship with Fortis.  Rather, the evidence indicates RSI and Kasoff were retained to provide financial advice to Fortis, which would include advice to reject unprofitable orders.  Accordingly, Kasoff's conduct, whether in his role as Fortis' CRO or agent, was privileged

11

against a claim of interference with Fortis' and Basler's contract and there is no evidence that would overcome that privilege.

Next, Basler contends that Kasoff's actions were actually in his role as an independent contractor arising from an October 2011 consulting agreement between RSI and Fortis. However, even under the independent contractor theory, Kasoff's conduct was still privileged.

Illinois recognizes a consultant's privilege, which provides a privilege to a consultant giving good-faith advice to a client that results in harm to a third party. *J.D. Edwards & Co. v. Podany*, 168 F.3d 1020, 1022 (7th Cir. 1999). The Seventh Circuit explained the reasoning behind the consultant privilege as follows:

> A consultant is hired to give advice. Often the advice is painful, because firms frequently turn to consultants when they are in trouble or when they want to do something that hurts and want to spread the blame a bit. The consultant's advice may lead to downsizing, layoffs, outsourcing, and countless other perturbations, including . . . contractual terminations. It would cast quite a large dark cloud over the consulting business if consultants could be hauled into court for having given advice that in hindsight could be characterized as having been ill-advised, ill-informed, or otherwise negligent. The consultant's privilege cuts off this possibility.

*J.D. Edwards & Co.*, 168 F.3d at 1022. Like the officer's and agent's privilege, the consultant's privilege is qualified and may be overcome if (1) the advice was outside the scope of the consultant's engagement; or (2) the advice was used to harm others exclusively for the consultant's "own benefit (or out of dislike of his victim) rather than for the benefit of his client." *Id*. at 1023 (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 678 (Ill. 1989)).

Here, there is no evidence that Kasoff's and RSI's conduct was outside of their consulting agreement. Rather, the advice Kasoff gave appears to fall exactly within the scope of any consulting agreement to salvage Fortis' financial affairs. Fortis retained RSI for its financial

advice, which is what it gave when it instructed Fortis to cease accepting Basler's purchase orders. There is no evidence that the advice to make this decision was exclusively for RSI's benefit or out of RSI's dislike of Basler. Rather, the evidence indicates this decision was made to financially benefit Fortis because Kasoff believed Fortis would lose more money if it continued to produce Basler's product at the current price. While this advice might be characterized as ill-advised or ill-informed given Fortis' and Basler's purchase agreement, more is required to overcome the consultant's privilege recognized under Illinois law. Accordingly, as a consultant, Kasoff and RSI enjoyed a privilege against a tortious interference claim.

Thus, viewing the evidence in the light most favorable to Basler, Kasoff's conduct was privileged under all of the theories of Kasoff's role offered by Basler, and RSI is entitled to judgment as a matter of law on Basler's tortious interference claim.

### c. Punitive Damages

Next, Defendants argue that Basler's claim for punitive damages must be dismissed. Basler is seeking punitive damages in its remaining conversion claim. Defendants argue there is no evidence supporting an award of punitive damages. Under Illinois law, punitive damages are available in a conversion claim. *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998). They are "awarded 'when torts are committed with fraud, actual malice, or when the defendant acts willfully, or with gross negligence as to indicate a wanton disregard of the rights of others.'" *Id.* (quoting *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978)).

Viewing the evidence in the light most favorable to Basler, there is at least some evidence that Fortis and RSI may not have been entitled to possession of all of Basler's tools. With that knowledge, they still withheld Basler's tools knowing that such action could injure Basler's company. Whether the Defendants' conduct arose to a level sufficient to sustain a punitive

damages award is for the jury to decide. As such, the Court denies Defendants' motion to the extent it seeks summary judgment on Basler's claim for punitive damages.

### d. Damage to the Tooling

Finally, Defendants argue Basler cannot recover for damage to its tooling because it has failed to present any evidence suggesting its tooling was damaged while under Fortis' control. In support of its argument, Defendants cite to a New York state appellate case in which the court found the defendant entitled to summary judgment because the plaintiff's pleadings and evidence suggested a rational explanation for the alleged damage and the plaintiff failed to present any evidence that the alleged damage occurred under the defendant's control. *See Hart v. City of Albany*, 272 A.D.2d 668, 668-69 (N.Y. App. Div. 2000).

Basler responded by attaching the employee affidavits concerning the tooling damage. The affidavit of Roger Churchill, a tooling supervisor for Basler, attested that it was his "belief, based upon 17 years working with plastic injection mold tooling that the damage shown on Exhibit A [describing damage to Basler's tools] was due to neglect, poor maintenance, and poor handling practices by Fortis. Doc. 52-3, p. 2. The affidavit of Gary Emig, Basler's Director of Supply Chain Management, attests that he was present when Basler's employees obtained the tools from Fortis' Carlyle, Illinois, facility. Doc. 52-4, p. 1. Due to time constraints, Emig states that Basler employees only inventoried the tooling and did not check for damage. *Id*. at 1-2. Upon inspection, Basler discovered damage to the tooling. *Id*. at 2. Unlike the evidence in *Hart*, these affidavits provide at least some evidence that Basler's tooling was damaged while it was in Fortis' possession, and the pleadings and evidence have suggested no other rational explanation for the damage. Accordingly, the Court denies Defendants' motion to the extent it seeks judgment as matter of law on the issue of damages to Basler's tooling.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment (Doc. 50). Specifically, the Court grants summary judgment in favor of RSI on Basler's tortious interference claim and directs the Clerk of Court to enter judgment accordingly at the close of this case. The Court denies summary judgment on Basler's conversion claim against Defendants, the issue of punitive damages, and the issue of damages resulting from damage to Basler's tooling.

**IT IS SO ORDERED.**

**DATED:** September 23, 2013

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
